**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ANTHONY ROMANO,

                              Plaintiff,

          v.                                            No. 9:17-CV-0137
                                                        (MAD/CFH)
DOCTOR WEINSTOCK, et al.,

                              Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

Anthony Romano
00-A-5352
Attica Correctional Facility
Box 149
Attica, New York 14011
Plaintiff pro se

Attorney General for the                  CHRISTOPHER J. HUMMEL, ESQ.[1]
    State of New York                     Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff pro se Anthony Romano ("plaintiff"), an inmate who was, at all relevant

times, in the custody of the New York Department of Corrections and Community

---

[1] The undersigned bears no relation to counsel for defendants.

[2] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Doctor ("Dr.") Weinstock, Dr. Kooi, Dr. A. Cincotta, Registered Nurse ("RN") Sue Lennox, RN Reilley, RN Jeanne Stanton, Mary Coryer, and Chief Medical Officer Carl J. Koenigsmann – who, at all relevant times, were employed or had duties at Auburn Correctional Facility ("Auburn") – violated his constitutional rights under the Eighth Amendment. Dkt. No. 1 ("Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 59. Plaintiff did not file a response. For the following reasons, it is recommended that defendants' motion be granted.

## I. Failure to Respond

Plaintiff did not oppose defendants' Motion for Summary Judgment and did not ask for an extension of time to respond. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 62. Additionally, the Court granted plaintiff two extensions of time to respond. Dkt. Nos. 64, 68. Thus, plaintiff was adequately apprised of the pendency of the motion and the consequences of failing to respond. However, "[t]he fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, a defendant is entitled to judgment only if the material facts demonstrate his entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). Additionally, "[a] verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material

2

issues of fact exist . . . ." <u>Colon v. Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted). "[T]o be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory." <u>Jackson v. Onondaga Cty.</u>, 549 F. Supp. 2d 204, 210 (N.D.N.Y. 2008). Even if a verified complaint is deemed nonconclusory, "it may be insufficient to create a factual issue where it is (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." <u>Id.</u>

Plaintiff's complaint states, "I certify under penalty of perjury that the foregoing is true and correct." Compl. at 17. Therefore, as plaintiff's complaint is verified,[3] the undersigned will accept plaintiff's complaint (Dkt. No. 1) to the extent that the statements are based on the plaintiff's personal knowledge or are supported by the record. <u>See</u> <u>Berry v. Marchinkowski</u>, 137 F. Supp. 3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider an unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

## II. Background

## A. Plaintiff's Recitation of the Facts

---

[3] The fact that plaintiff's complaint is not notarized is immaterial under 28 U.S.C. § 1746. <u>See</u> <u>Hameed v. Pundt</u>, 964 F. Supp. 836, 840-41 (S.D.N.Y. 1997) (deeming an unnotarized document admissible in support of a summary judgment motion so long as that document contains the statement "I declare under penalty of perjury that the foregoing is true and correct.").

The facts are related herein in the light most favorable to plaintiff as the nonmoving party.  See subsection III.A infra.  Plaintiff contends that while housed at Auburn, Dr. Weinstack, Dr. Kooi, Dr. Cincotta, RN Lennox, RN Reilley, and RN Stanton denied him medical care and treatment, including an MRI, a back brace, a knee brace, an elbow brace, a neck brace, and pain medications.  Compl. at 14-15.  Additionally, Dr. Koenigsmann denied plaintiff's letter requests for further relief.  Id. at 16.

## B. Defendants' Recitation of the Facts

In support of this motion, defendants filed a Statement of Material Facts.[4]

## 1. Dr. Weinstock

---

[4] Local Rule 7.1(a)(3) states:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R.  7.1(a)(3).

4

As a physician at Auburn, Dr. Weinstock is responsible for "evaluating and treating inmates through sick call, emergency sick call, and in an infirmary setting," as well as "provid[ing] care for inmates' chronic and episodic medical conditions." Dkt. No. 59-1 ¶ 3. Dr. Weinstock treated plaintiff twice while he was housed at Auburn. Id. ¶¶ 2, 8. On May 19, 2014, Dr. Weinstock met with plaintiff, who requested a back brace for his chronic back pain. Id. ¶ 9. Dr. Weinstock evaluated plaintiff's symptoms, and determined that because plaintiff demonstrated full flexibility in his back, there was no evidence of a disability. Id. Thus, Dr. Weinstock determined that it would be "medically inappropriate" to issue plaintiff a back brace. Id. Dr. Weinstock informed plaintiff that he would obtain the results of his electromyography ("EMG") scan, and continue to evaluate plaintiff's condition. Id. Dr. Weinstock also noted that he would review plaintiff's need for Enteric-coated Aspirin ("ECASA"). Id. Dr. Weinstock ordered a computerized-tomography ("CT") scan to evaluate a potential mass on plaintiff's neck. Id. Dr. Weinstock scheduled plaintiff for an EKG on August 13, 2014, and plaintiff refused the procedure. Id. ¶ 10. Dr. Weinstock also scheduled plaintiff for a CT scan on July 21, 2014 at SUNY Upstate Medical University Hospital. Id. ¶ 11. Plaintiff refused to undergo the CT scan and the blood work and lab procedures prior to the scan. Id. ¶ 12.

On July 30, 2014, plaintiff met with Dr. Weinstock for his second appointment. Dkt. No. 59-1 ¶ 15. Plaintiff again requested a back brace, and stated that he had not been taking his medications because he had not received his back brace. Id. Dr. Weinstock evaluated plaintiff's pain symptoms, and determined there was no need for a back brace. Id. Dr. Weinstock also discontinued plaintiff's Naprosyn prescription due to his non-

compliance.  Id.  Instead, Dr. Weinstock prescribed plaintiff Mobic, a non-steroidal anti-inflammatory to treat his pain symptoms.  Id.  Plaintiff complained of pain in his right hand, and Dr. Weinstock ordered an X-ray to determine the cause.  Id.  Plaintiff stated that he had callouses on his foot, and Dr. Weinstock determined that they were minor and did not require additional medical treatment.  Id.  After a series of rescheduled dates, plaintiff refused the X-ray of his right hand on August 13, 2014.  Id. ¶ 16.  Dr. Weinstock determined that plaintiff's symptoms did not require an MRI or referral to a neurosurgeon.  Id. ¶ 17.  Plaintiff did not tell Dr. Weinstock that he wished any of his cancelled procedures be rescheduled.  Id. ¶ 18.

## 2. Dr. Kooi

As the Facility Health Services Director, Dr. Kooi "was responsible for all medical care provided to the inmates incarcerated at Auburn."  Dkt. No. 59-1 ¶ 22.  On September 5, 2014, plaintiff refused to attend an appointment with Dr. Kooi, and signed a medical refusal form.  Id. ¶ 28.  On November 6, 2014, Dr. Kooi met with plaintiff, who complained of back pain and requested a back brace.  Id. ¶ 29.  Dr. Kooi evaluated plaintiff, and determined that his "forward flexion in his back and knee jerk" were both normal.  Id.  Plaintiff further performed the "straight leg raising test" with no difficulty.  Id.  Thus, Dr. Kooi determined that plaintiff did not need a back brace.  Id.  Dr. Kooi recommended that plaintiff perform back exercises to manage his pain, but plaintiff refused to learn the exercises.  Id.  Dr. Kooi prescribed plaintiff Motrin for pain relief, and advised him to stop smoking.  Id.

On November 12, 2014, Dr. Kooi treated plaintiff for a facial laceration with sutures. Dkt. No. 59-1 ¶ 30.   He also gave plaintiff tetanus and diphtheria shots, as well as an antibiotic.  Id.  On November 21, 2014, Dr. Kooi removed plaintiff's sutures.  Id. ¶ 31.  On December 16, 2014, Dr. Kooi met with plaintiff, who complained of foot and back pain.  Id. ¶ 32.  Dr. Kooi evaluated plaintiff, and concluded that his forward flexion in his back and his gait were normal.  Id.  Dr. Kooi submitted a request for plaintiff's special-issue medical boots to be replaced.  Id.  Dr. Kooi again instructed plaintiff on exercises to strengthen his back.  Id.

On January 5, 2015, Dr. Kooi met with plaintiff and scheduled him for a colonoscopy on May 21, 2015.  Dkt. No. 59-1 ¶ 34.  On May 19, 2015, plaintiff signed a form refusing to undergo the colonoscopy because "he felt it was not as serious as having his throat examined."  Id. ¶ 35.  On February 24, 2015, Dr. Kooi met with plaintiff, who complained of cold symptoms.  Id. ¶ 36.  Dr. Kooi assessed plaintiff's symptoms and prescribed him Mucinex, as well as Vitamin E to treat his skin lesions.  Id.  Dr. Kooi determined that plaintiff's symptoms did not require an MRI or referral to a neurosurgeon.  Id. ¶ 38.  Plaintiff did not indicate to Dr. Kooi that he wished any of his cancelled procedures be rescheduled. Id. ¶ 40.

### 3. Dr. Cincotta

As a physician at Auburn, Dr. Cincotta was responsible for "evaluating and treating inmates through sick call, emergency sick call, and in an infirmary setting," as well as "provid[ing] care for inmates' chronic and episodic medical conditions."  Dkt. No. 59-1 ¶ 44.

7

He worked in the infirmary on a per-diem basis, one to two days per week. Id. ¶ 43. Dr. Cincotta treated plaintiff twice. Id. ¶ 49. On May 13, 2015, plaintiff complained to Dr. Cincotta about dry skin, arthritis in his hand, and pain in his left elbow. Id. ¶ 50. Plaintiff informed Dr. Cincotta that he had not yet received new medical boots. Id. Dr. Cincotta provided plaintiff with Hydrocerin to treat his dry skin, and Mobic for his chronic pain and arthritis. Id. Dr. Cincotta determined that plaintiff's symptoms would benefit from a knee brace and an elbow brace, and he ordered these items for plaintiff. Id.

On August 5, 2015, Dr. Cincotta met with plaintiff, who complained of weight loss, difficulty drinking and swallowing, pain in his left elbow, neck, and knee, as well as dry skin. Dkt. No. 59-1 ¶ 51. Dr. Cincotta ordered plaintiff a complete physical examination, continued plaintiff's Mobic prescription, and ordered x-rays. Id. ¶ 51. To further assess plaintiff's weight loss, Dr. Cincotta ordered a Chemprofile, a complete blood count test, and a thyroid-stimulating hormone test. Id. Dr. Cincotta also prescribed plaintiff Prilosec to address his difficulties swallowing, and referred him to a specialist. Id. Dr. Cincotta determined that plaintiff's symptoms did not require an MRI or referral to a neurosurgeon. Id. ¶ 52.

**4. Dr. Koenigsmann**

As DOCCS Deputy Commissioner and Chief Medical Officer, Dr. Koenigsmann's primary responsibilities include policy development and overseeing the administration of medical care to all inmates in DOCCS custody. Dkt. No. 59-1 ¶¶ 55, 57. Due to his title and position of authority within DOCCS, Dr. Koenigsmann receives several thousand letters

each year addressed to him from inmates or individual's on an inmate's behalf. Id. ¶ 59. Plaintiff mailed four letters to Dr. Koenigsmann's office: dated July 10, 2014, August 31, 2014, April 9, 2015, and October 5, 2015. Id. ¶ 61. Plaintiff's brother contacted Dr. Koenigsmann's office on or about October 22, 2014 regarding plaintiff's dental care. Id. ¶ 61. The inquiry from plaintiff's brother was forwarded to non-party Director of Correctional Dental Services Mary D'Silva. Id. Plaintiff's letters were referred to subordinate staff for a response. Id. ¶ 62. Non-party Regional Health Services Administrator Russell Blair timely responded to plaintiff's July 10, 2014, April 9, 2015, and October 5, 2015 letters. Id. Ms. D'Silva responded to plaintiff's August 31, 2014 letter and the inquiry from plaintiff's brother in separate correspondences. Id. Dr. Koenigsmann did not personally review or respond to plaintiff's letters, nor did he ever provide plaintiff with medical care. Id. ¶¶ 63, 65.

### 5. RN Lennox

Ms. Lennox, a registered nurse at Auburn, met with plaintiff on various occasions for sick call. Dkt. No. 59-1 ¶¶ 73, 74. On May 23, 2014; June 2, 2014; June 16, 2014; June 19, 2014; October 6, 2014; and October 10, 2014, plaintiff complained of mild cold symptoms and requested cold medicine. Id. ¶ 74. Ms. Lennox provided plaintiff with over-the-counter cold medicines, including Medicidin-D and Motrin, and advised plaintiff to increase his fluid intake. Id. On at least six other occasions, plaintiff refused to see Ms. Lennox when she arrived at his cell for requested sick call. Id. ¶ 75. On May 14, 2014, Ms. Lennox documented which of plaintiff's medications needed renewal, and sent his chart to his provider for an upcoming appointment. Id. ¶ 76. On June 9, 2014, Ms. Lennox met with

plaintiff for sick call, and he did not complain of any medical problems. Id. ¶ 77. On July 14, 2014, Ms. Lennox met with plaintiff, and he complained of callouses on his feet. Id. ¶ 78. Ms. Lennox provided plaintiff with Motrin, and acknowledged that he had an upcoming appointment with his medical provider. Id. On October 6, 2014, Ms. Lennox met with plaintiff, and he complained of back pain. Id. ¶ 79. Ms. Lennox evaluated plaintiff's symptoms, and noted that he had a "review-by-date of October 20, 2014." Id. On July 4, 2015, Ms. Lennox treated plaintiff for a "superficial" cut on his left cheek. Id. ¶ 80. Plaintiff never informed Ms. Lennox that he had been denied an MRI, a colonoscopy, an endoscopy, braces for pain management, medical boots, Boost, Ensure, an EEG, an EKG, or a referral to a neurosurgeon. Id. ¶ 82.

### 6. RN Reilley

Ms. Reilley, a registered nurse at Auburn, met with plaintiff on various occasions for sick call. Dkt. No. 59-1 ¶¶ 85, 93. On July 15, 2014; October 27, 2014; November 4, 2014; December 1, 2014; December 4, 2014; January 20, 2015; February 10, 2015; February 13, 2015; March 9, 2015; March 12, 2015; March 26, 2015; April 23, 2015; May 5, 2015; May 14, 2015; May 21, 2015; and June 2, 2015, plaintiff complained of dry skin, minor rashes, mild cold symptoms, and requested cold medicine. Id. ¶ 92. Ms. Reilley noted her evaluations of plaintiff's symptoms in his chart, and often provided him with "'over the counter' balms, creams, pain medication, such as Motrin or Tylenol, and cold medicines such as Medicidin-D." Id. She also advised him to increase his fluid intake. Id. On at least nine other occasions, plaintiff refused to see Ms. Reilley when she arrived at his cell for

requested sick call. Id. ¶ 93.

On July 15, 2014, during sick call, plaintiff complained that the callouses on his feet caused him pain. Dkt. No. 59-1 ¶ 94. Ms. Reilley was unable to supply him with Motrin, as plaintiff was taking Naprosyn. Id. She informed plaintiff that he had an upcoming appointment with his medical provider who could address his medication concerns at that appointment. Id. On November 18, 2014, Ms. Reilley met with plaintiff, and he complained of a headache and jaw pain. Id. ¶ 95. Ms. Reilley noted that plaintiff had sutures on the right side of his face, and that he had a scheduled follow-up appointment with his medical provider where he could address further pain concerns. Id. On December 1, 2014, Ms. Reilley met with plaintiff, and he complained of back pain. Id. ¶ 96. She informed plaintiff that he had an upcoming appointment at which he could raise his concerns. Id. On December 19, 2014, Ms. Reilley met with plaintiff, and he inquired about the scheduling of his colonoscopy and his request for medical boots. Id. ¶ 97. Ms. Reilley noted plaintiff's concerns in his chart, and sent it to plaintiff's medical provider to discuss at his upcoming appointment. Id.

On January 20, 2015, Ms. Reilley met with plaintiff, and he complained of back aches. Dkt. No. 59-1 ¶ 98. She noted that plaintiff had received Bengay to treat his pain symptoms, and that he had an upcoming medical appointment with his medical provider where he could further discuss his concerns. Id. On January 30, 2015, Ms. Reilley met with plaintiff, and he complained of right hand pain and arthritis. Id. ¶ 99. Ms. Reilley determined that plaintiff had good movement in his hand, wrist, and fingers. Id. She noted that plaintiff had an upcoming medical appointment where he could further discuss his

11

concerns. Id. On February 5, 2015, Ms. Reilley met with plaintiff, and he complained of back pain. Id. ¶ 100. Ms. Reilley provided plaintiff Motrin. Id. On March 9, 2015, Ms. Reilley met with plaintiff, and he complained of back pain. Id. ¶ 101. Ms. Reilley determined that plaintiff walked with no problems, and informed plaintiff that he had an upcoming medical appointment where he could further address his concerns. Id. On March 26, 2015, Ms. Reilley met with plaintiff, and he complained of neck pain. Id. ¶ 102. Ms. Reilley determined that plaintiff could move his neck without issue, and provided him with Tylenol. Id. On March 21, 2015, Ms. Reilley met with plaintiff, and he complained of blood from hemorrhoids after bowel movements. Id. ¶ 103. Ms. Reilley noted plaintiff's concerns and provided him hemorrhoid cream. Id.

On April 24, 2015, Ms. Reilley met with plaintiff, and he complained of bone pain and arthritis. Dkt. No. 59-1 ¶ 104. She determined that plaintiff had a full range of motion, but provided him Motrin. Id. She also noted that he had an upcoming medical appointment where he could further address his concerns. Id. On May 21, 2015, Ms. Reilley met with plaintiff, and he inquired about "braces for his pain." Id. ¶ 105. Ms. Reilley noted plaintiff's request in his chart so the medical provider could review it at his next appointment. Id. On June 2, 2015, Ms. Reilley met with plaintiff, and he complained of lower back pain. Id. ¶ 106. Ms. Reilley determined that plaintiff could walk without issue, and informed him that he could address any further concerns at his upcoming medical appointment. Id. Plaintiff never informed Ms. Reilley that he had been denied an MRI, a colonoscopy, an endoscopy, braces for pain management, medical boots, Boost, Ensure, an EEG, an EKG, or a referral to a neurosurgeon. Id. ¶ 108.

### 6. RN Stanton

Ms. Stanton, a registered nurse at Auburn, met with plaintiff on various occasions for sick call.   Dkt. No. 59-1 ¶¶ 110, 118.   On July 21, 2015; September 11, 2015; September 29, 2015; October 2, 2015; October 9, 2015; and October 22, 2015, plaintiff complained of mild cold symptoms, dry skin, athlete's foot, dandruff, and requested cold medicine and other medicine for these conditions.   Id. ¶ 119.   Ms. Stanton noted her evaluations of plaintiff's symptoms in his chart, and often provided him with "'over the counter' medicines including Medicidin-D and cough syrup for his cold symptoms, foot powder and hydrocortisone cream for his feet, and Motrin for his chronic pain symptoms."   Id.   She also advised plaintiff to increase his fluid intake.   Id.   On at least seven other occasions, plaintiff refused to see Ms. Stanton when she arrived at his cell for requested sick call.   Id. ¶ 119.

On November 12, 2014, Ms. Stanton met with plaintiff, and treated him for a facial laceration with fifteen sutures.   Dkt. No. 59-1 ¶ 120.   Ms. Stanton also administered plaintiff a Tetanus shot.   Id.   On July 14, 2015, Ms. Stanton met with plaintiff, and he complained of pain in the upper right portion of his back.   Id. ¶ 121.   Plaintiff also inquired about his medical boots.   Id.   Ms. Stanton provided plaintiff with Motrin, and informed him that he could further discuss the need for medical boots at the upcoming medical appointment with his medical provider.   Id.   On September 14, 2015, Ms. Stanton met with plaintiff, and he complained of body aches.   Id. ¶ 122.   Although Ms. Stanton determined that plaintiff walked without difficulty, she provided him with Motrin.   Id.   On September 29, 2015, Ms. Stanton met with plaintiff, and he requested Boost.   Id. ¶ 123.   Ms. Stanton did not provide plaintiff with Boost, as a Nurse Practitioner had discontinued plaintiff's prescription for Boost

six days prior. Id. Ms. Stanton noted that plaintiff would be scheduled for an appointment with a medical provider soon, and that he could raise any further concern at that appointment. Id.

Ms. Stanton met with plaintiff on October 9, 2015 and October 13, 2015, and he inquired about his medical boots. Dkt. No. 59-1 ¶ 124. Ms. Stanton informed plaintiff that he had been approved for new boots, but it was unclear whether he had been measured by the state shop for the boots to be issued. Id. She noted that plaintiff had an upcoming medical appointment, and could raise any concerns at that appointment. Id. Plaintiff received the medical boots on November 3, 2015. Id. On November 18, 2015, Ms. Stanton met with plaintiff after he was involved in an alleged altercation. Id. ¶ 125. Ms. Stanton did not observe any injuries, and plaintiff denied having injuries. Id. Plaintiff never informed Ms. Stanton that he had been denied an MRI, a colonoscopy, an endoscopy, braces for pain management, medical boots, Boost, Ensure, an EEG, an EKG, or a referral to a neurosurgeon. Id. ¶ 127.

### 7. Mary Coryer

As Nurse Administrator, Ms. Coryer routinely investigated grievance complaints concerning the Auburn nursing staff, and maintained documents as to the outcome of those investigations. Dkt. No. 59-1 ¶ 133. Ms. Coryer investigated four grievances plaintiff filed prior to June 12, 2015 concerning his complaints against the nursing staff. Id. ¶ 135. In investigating plaintiff's grievances, Ms. Coryer obtained a memorandum from the nursing staff member involved, and sought other information as necessary to investigate plaintiff's

complaints. Id. ¶ 136.  Ms. Coryer submitted this information to the Auburn grievance office.

Id.  Based on her investigation and review of plaintiff's medical records, Ms. Coryer

determined that plaintiff's complaints were unsubstantiated, and the Auburn nursing staff

provided him appropriate care. Id. ¶ 137.


### III. Discussion[5]

Plaintiff contends that Dr. Weinstock, Dr. Kooi, Dr. A. Cincotta, RN Lennox, RN

Reilley, Ms. Coryer, RN Stanton, and Chief Medical Officer Carl J. Koenigsmann were

deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

See generally Compl.  Defendants move for summary judgment on the grounds that

(1) plaintiff failed to exhaust his administrative remedies; (2) plaintiff cannot establish an

Eighth Amendment deliberate medical indifference claim; (3) defendants were not

personally involved in the treatment of some or all of plaintiff's medical conditions; and

(4) defendants are entitled to qualified immunity.  See generally Dkt. No. 61 ("Def. Mem. of

Law").


### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a).  The moving party has the burden of showing the absence of disputed

---

[5]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest

16

arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Exhaustion

As a threshold matter, defendants argue that plaintiff has failed to exhaust his administrative remedies.  Def. Mem. of Law at 8-11.  Specifically, defendants allege that of the eight grievances plaintiff filed with the Auburn Inmate Grievance Committee ("IGRC") prior to the commencement of this action on June 12, 2015, plaintiff only appealed five to CORC. Id. at 10.  Of the five grievances appealed to CORC, plaintiff had received only four decisions by June 12, 2015.  Id.  Moreover, defendants contend that the four properly-filed grievances do not address the expansive medical concerns plaintiff raised in his complaint and at his deposition.  Id.

On August 5, 2014, the Auburn IGRC received plaintiff's July 30, 2014 grievance (AUB-65510-14) alleging that Dr. Weinstock denied him a back brace, failed to remove a callous from his foot, and denied him an X-ray of his right hand.  Dkt. No. 60-1 at 15.  The IGRC found that Dr. Weinstock determined that plaintiff did not need a back brace, the callous on plaintiff's foot did not need immediate treatment, and an X-ray of plaintiff's right

17

hand was ordered. Id. at 20. The IGRC granted plaintiff's grievance to the extent that plaintiff's "medical needs and health concerns should be addressed properly and in a timely fashion." Id. Plaintiff appealed the decision to the Superintendent. Id. On August 26, 2014, the Superintendent upheld the decision of the IGRC, and plaintiff appealed to CORC. Id. at 17. On December 17, 2014, CORC upheld the Superintendent's response. Id. at 18.

On September 24, 2014, plaintiff filed a grievance (AUB-65826-14) alleging that a nurse, later determined to be Ms. Lennox,[6] forced him to sign a refusal form, but did not specify what procedure or medication he was forced to refuse. Dkt. No. 60-1 at 38-39. The IGRC denied plaintiff's grievance, and he appealed. Id. at 43. On November 7, 2014, the Superintendent upheld the IGRC's decision. Id. at 44. Plaintiff filed an appeal. Id. On February 25, 2015, CORC upheld the Superintendent's determination, and plaintiff's grievance was denied as without merit. Id. at 35.

On November 14, 2014, plaintiff filed a grievance (AUB-66215-14) alleging that Dr. Kooi denied his request for a back brace to treat his chronic back pain. Dkt. No. 60-1 at 54-55. The IGRC found that plaintiff had a permit that allowed him to have a back brace in all facilities, and agreed that his medical needs and health concerns should be addressed properly and in a timely fashion. Id. at 53. On December 17, 2014, the Superintendent upheld the findings of the IGRC, and plaintiff appealed. Id. at 61. On March 18, 2015, CORC upheld the Superintendent's determination. Id. at 51.

On March 12, 2015, plaintiff filed a grievance (AUB-66802-15) alleging that Ms.

---

[6] Plaintiff names "Sue Pellington" in the grievance, but DOCCS records indicate that Sue Lennox was the nurse on duty. See Dkt. No. 60-1 at 43.

Reilley was verbally abusive and denied him cough syrup, Medicidin-D, and analgesic balm. Dkt. No. 60-1 at 94-98.  IGRC referred the grievance directly to the Superintendent, who denied plaintiff's grievance.   Id. at 99.   Plaintiff appealed the Superintendent's determination.  Id.  On May 20, 2015, CORC determined that they had "not been presented with sufficient evidence to substantiate malfeasance by staff." Id. at 87.

On April 24, 2015, plaintiff filed a grievance (AUB-67112-15) alleging that he was denied sick call in retaliation for his grievance against Ms. Reilley.  Dkt. No. 60-1 at 103, 110-13.  IGRC referred the grievance directly to the Superintendent, and on May 12, 2015, the Superintendent denied plaintiff's grievance.  Id. at 114.  Plaintiff appealed to CORC. Id.  On July 1, 2015, CORC upheld the Superintendent's determination.  Id. at 101.

On May 27, 2015, plaintiff filed a grievance (AUB-67268-15) alleging that Ms. Stanton denied him an EKG.  Dkt. No. 59-10 ("Parmiter Decl.") at 36-42.  On June 4, 2015, IGRC found that plaintiff received an EKG on May 19, 2015, and a medical provider reviewed that scan.  Id. at 34.  IGRC granted plaintiff's grievance to the extent that his "medical needs and health concerns should be addressed properly and in a timely fashion." Id.  Plaintiff did not appeal this grievance.  See id.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006).  The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S.

19

at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  Id. at 524.  To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated.  See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted).  The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement."  Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016).  Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA.  Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[7]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion."  Ross, 136 S. Ct. at 1858.  Under this exception, courts must determine whether administrative remedies were "available" to a prisoner.  Id.  The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may

---

[7] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception.  See Williams, 829 F.3d at 123.  The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."  Id. (citing Ross, 136 S. Ct. at 1858-59).

promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?[8]

Although defendants concede that plaintiff properly exhausted grievances AUB-65510-14, AUB-65826-14, AUB-66215-14, and AUB-66802-15 prior to the commencement of this action, it is clear that plaintiff did not address the majority of his claims in these grievances.  See Def. Mem. of Law at 11.  Plaintiff's four fully exhausted grievances are limited to allegations against (1) Dr. Weinstock for denying plaintiff a back brace and X-ray of his right hand, and failing to remove callouses from his foot; (2) Ms. Lennox for forcing plaintiff to sign a refusal form; (3) Dr. Kooi for denying plaintiff a back brace; and (4) Ms.

---

[8] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1).  An IGP representative has sixteen calendar days to informally resolve the issue.  Id. § 701.5(b)(1).  If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing.  Id. §§ 701.5(b)(2)(i)-(ii).  If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  Id. § 701.5(c)(1).  If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination.  Id. §§ 701.5(d)(i)-(ii).  CORC must review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received."  Id. § 701.5(d)(3)(ii).  Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

Reilley for denying plaintiff cough syrup.  See Dkt. No. 60-1 at 15, 38-39, 54-55, 94-98. Thus, to the extent that plaintiff's Eighth Amendment deliberate indifference claim is based on these allegations, the undersigned finds that plaintiff has exhausted his claim as they were properly grieved prior to commencing this action.

However, as stated, an inmate must first fully exhaust his or her grievances prior to commencing a federal action.  See Green v. Schmelzle, 239 F. Supp. 3d 669, 672 (W.D.N.Y. 2017) ("Exhaustion is mandatory — unexhausted claims may not be pursued in federal court.") (internal quotation marks omitted) (quoting Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011)).  Although plaintiff filed grievance AUB-67112-15 on April 24, 2015 alleging that non-party officers retaliated against him for grievances filed against Ms. Reilley, he did not receive a final decision from CORC until July 1, 2015  — nearly one month after the commencement of this action.  See Dkt. No. 60-1 at 101, 103, 110-13, 114.  Thus, the undersigned finds that plaintiff has not exhausted his administrative remedies.  See Burgess v. Morse, 259 F. Supp. 2d 24, 247 (W.D.N.Y. 2003) ("[E]ven assuming that Grievance No. 23039-02 was sufficiently related to plaintiff's claims here, he improperly exhausted those claims after commencing this action.") (citation omitted).  Further, plaintiff failed to appeal to the Superintendent his May 25, 2015 grievance against Ms. Stanton for failure to refer him for an EKG.  See Parmiter Decl. at 36-42.  Therefore, to the extent that plaintiff's Eighth Amendment claim is based on Ms. Stanton's failure to refer plaintiff for an EKG, the undersigned finds that plaintiff has failed to exhaust his administrative remedies.

As to plaintiff's remaining claims concerning defendants' alleged denial of medical care for elbow pain, neck pain, shoulder pain, weight loss, or denial of prescription pain

medication, elbow brace, neck brace, shoulder brace, a colonoscopy, an endoscopy, a CT scan, an EEG, an EKG, a cane, Boost, Ensure, medical boots, or referrals to a neurosurgeon, plaintiff has failed to exhaust his administrative remedies.   Auburn Inmate Grievance Program Supervisor Cheryl Parmiter declared that plaintiff did not file grievances concerning a denial of "pain medication, a computerized tomography scan, a colonoscopy, an endoscopy, an electroencephalogram, Boost, Ensure, medical boots, a magnetic resonance imaging scan, a can, or a referral to a Neurosurgeon" prior to June 12, 2015. Parmiter Decl. ¶ 22.  However, DOCCS records indicate that plaintiff filed approximately eleven grievances after the commencement of this action concerning these remaining claims.  See id. at 13-16.   Irrespective of whether these grievances were fully exhausted, plaintiff filed them after commencing this action on June 12, 2015, and, therefore, they were not properly exhausted for the purposes of this case.  See Green, 239 F. Supp. 3d at 672.

Thus, as to plaintiff's claims alleging he was denied pain medication; elbow, neck, and shoulder braces; a colonoscopy; a CT scan; an EEG; an EKG; meal supplements; medical boots; or a neurosurgeon referral, the undersigned finds that plaintiff has not fully exhausted his administrative remedies, and it is recommended that defendants' motion on this ground be granted.[9]

## C. Personal Involvement

Defendants contend that they were not personally involved in all or some treatment

---

[9] Defendants do not dispute that plaintiff properly exhausted grievances: AUB-65510-14, AUB-65826-14, AUB-66215-14, and AUB-66802-15.  See Def. Mem. of Law at 10-11.

of plaintiff's medical conditions.  Def. Mem. of Law at 20-24.  To hold a defendant liable under section 1983, the plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Supervisory officials may not be held liable merely because they held a position of authority.  See Wright, 21 F.3d at 501; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, a defendant may be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[10]  Assertions of personal involvement that are merely speculative

---

[10] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743

are insufficient to establish a triable issue of fact.  See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).  Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation. Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

### a. Dr. Koenigsmann

Plaintiff suggests that Dr. Koenigsmann was personally involved in his constitutional deprivations because plaintiff wrote him letters informing him that Auburn employees were denying him all medical care.  Pl. Dep. at 63-64.  Dr. Koenigsmann declared that, as a supervisor, he does not provide medical care to individual inmates, and leaves such decisions to the inmate's individual doctor.  Dkt. No. 59-2 ("Koenigsmann Decl.") ¶ 5. He further declared that he does not review inmate correspondence, and, generally, his administrative staff delegates the letter to the appropriate Division of Health Services official. Id. ¶ 6.

To the extent that plaintiff seeks to establish Dr. Koenigsmann's knowledge of his complaints through sending letters, this argument must fail.  It is well-settled that merely writing letters and grievances to a defendant is insufficient to establish personal involvement.   See Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006)

---

F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold the official liable for the alleged violation.") (quotations omitted). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (citing cases). Although case law affirms that at the pleading stage, a plaintiff may establish personal involvement of a defendant if he can demonstrate that he sent the letter to defendant "at an appropriate address and by appropriate means," Grullon v. City of New Haven, 720 F.3d 133, 141 (2d Cir. 2013), the standard is heightened on a motion for summary judgment. See Braham v. Perelmuter, No. 3:15-CV-1094 (JCH), 2017 WL 3222532, at *13 (D. Conn. July 28, 2017) (detailing the heightened summary judgment standard). "Once the defendant moves for summary judgment, [ ] a plaintiff must provide evidence to support his claim that the defendant in fact received the letter, had actual knowledge of the risk of harm or unconstitutional conditions, and failed to make any effort to remedy the conditions or to prevent or protect the plaintiff from the harm." Id. Plaintiff has not proffered evidence, and there is no indication in the record, that Dr. Koenigsmann received and/or read plaintiff's letters; in fact, Dr. Koenigsmann declares that he does not read correspondence sent to him, and "[i]n accordance with the normal and ordinary

26

procedure of [his] office, when inmate letters are received, they are reviewed by administrative staff who determine which Division of Health Services official the letter should be forwarded to. Koenigsmann Decl. ¶ 6. Moreover, Dr. Koenigsmann has no recollection of personally reviewing or responding to plaintiff's letters. Id. ¶ 10.

Although Mr. Blair and Ms. D'Silva responded to plaintiff's letters and plaintiff's brother's inquiry on behalf of Health Services, this does not establish Dr. Koenigsmann's personal involvement, as it is within the purview of a superior officer to delegate responsibilities to others. See Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing Ortiz-Rodriquez, 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)). Moreover, plaintiff does not allege that Dr. Koenigsmann created a policy or custom under which unconstitutional practices occurred, nor is there any indication that Dr. Koenigsmann was grossly negligent or deliberately indifferent to his rights. See Colon, 58 F.3d at 873. Plaintiff may not name and attempt to hold Dr. Koenigsmann liable merely because he holds a position of authority within the prison system without substantiating claims against him. See Colon, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain Colon's claim."). Thus, plaintiff has failed to establish that Dr. Koenigsmann was personally involved in any alleged Eighth Amendment violation. Accordingly, it is recommended that defendants' motion be granted, and that all claims against Dr. Koenigsman be dismissed with prejudice for lack of personal involvement. See Liner v. Goord, 310 F. Supp. 2d 550, 554 (W.D.N.Y. 2004) (dismissing the plaintiff's claims

against [the defendant] for lack of personal involvement with prejudice).

### b. Ms. Coryer

Plaintiff contends that Ms. Coryer denied him "all medical." Pl. Dep. at 63. As a Nurse Administrator, Ms. Coryer's responsibilities include supervising the Registered Nurses at Auburn, and investigating grievances concerning the conduct of the nursing staff referred to her by Auburn IGRC. Dkt. No. 59-2 ("Coryer Decl.") ¶¶ 4, 6. Ms. Coryer's responsibilities generally do not include providing direct medical care to individual inmates. Id. ¶ 5. Ms. Coryer declared that she investigated four of plaintiff's grievances[11] which alleged that (1) Ms. Lennox acted unprofessionally and denied him some type of treatment; (2) Ms. Lennox forced him to sign a refusal form; (3) Ms. Reilley verbally abused and harassed him; and (4) a non-party nurse verbally harassed him. Id. ¶¶ 8, 17; Parm Decl. at 9, 12, 18-23, 25-43; Dkt. No. 60-1 at 35-49, 86-99. In accordance with Auburn policy, Ms. Coryer investigated the allegations contained in each of plaintiff's grievances, directed all nursing staff members involved to draft a memorandum regarding the incident, and summarized her findings for the IGRC. See Coryer Decl. ¶¶ 7, 9; Parmiter Decl. at 19, 27, 35; Dkt. No. 60-1 at 93.

As stated, although the mere receipt of a letter or grievance from an inmate is insufficient to establish a defendant's personal involvement in the alleged constitutional violation, "[p]ersonal involvement will be found . . . where a supervisory official receives and

---

[11] Ms. Coryer's name inadvertently appeared in a memorandum within grievance AUB-65510-14 alleging violations against Dr. Weinstock. Coryer Decl. ¶ 17. Ms. Coryer does not investigate grievances concerning a doctor's conduct. Id.

acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."
Johnson, 234 F. Supp. 2d at 363-64.  The record establishes that Ms. Coryer did more than
simply deny plaintiff's grievance; instead, she offered detailed responses that addressed
plaintiff's specific allegations.  See Dkt. No. 60-1 at 93; Parmiter Decl. at 27; see also Mateo
v. Fischer, 682 F. Supp. 2d 423, 430-31 (S.D.N.Y. 2010) (acknowledging that "some courts
distinguish between the degree of response to an inmate's grievance [in assessing personal
involvement] — for example, between summarily denying a grievance and denying it in a
detailed response that specifically addresses the plaintiff's allegations.").  However, in this
Circuit, courts also consider whether the alleged constitutional violation is "ongoing" or
discrete, and, therefore, whether the defendant supervisor can offer a remedy.  Young v.
Choinski, 15 F. Supp. 3d 172, 192 (D. Conn. 2014) (citing Burton v. Lynch, 664 F. Supp.
2d 349, 360 (S.D.N.Y. 2009)).  For instance,

> if the supervisory official is confronted with an "ongoing"
> constitutional violation and reviews a grievance or appeal
> regarding that violation, that official is "personally involved" if he
> or she can remedy the violation directly.  In contrast, "[i]f the
> official is confronted with a violation that has already occurred
> and is not ongoing, then the official will not be found personally
> responsible for failing to remedy a violation."

Id. (quoting Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008)).

Here, it is clear that plaintiff submitted grievances as to alleged violations that had
already occurred.  See Parm. Decl. at 9, 12, 18-23, 25-43; Dkt. No. 60-1 at 35-49, 86-99.
Therefore, Ms. Coryer could not remedy the alleged underlying conduct, as the conduct was
not ongoing.  Thus, plaintiff has failed to establish that Ms. Coryer was personally involved
in any alleged Eighth Amendment violation.    Accordingly, it is recommended that

29

defendants' motion be granted, and that all claims against Ms. Coryer be dismissed with prejudice for lack of personal involvement. See Liner, 310 F. Supp. 2d at 554.

### c. Ms. Lennox, Ms. Reilley, and Ms. Stanton

Ms. Lennox, Ms. Reilley, and Ms. Stanton contend that they were not personally involved in plaintiff's Eighth Amendment claim insofar as he claims that he was "denied an MRI, colonoscopy, endoscopy, Boost, Ensure, an EEG, an EKG, or a referral to a neurosurgeon." Def. Mem. of Law at 22-23. Even construing plaintiff's allegations liberally, the undersigned finds that plaintiff has not adequately demonstrated Ms. Lennox, Ms. Reilley, and Ms. Stanton's personal involvement in the alleged Eighth Amendment violation as to the abovementioned claims. Ms. Lennox, Ms. Reilley, and Ms. Stanton all declare that they had no knowledge of such complaints by plaintiff, and, there is no indication in the record that they knew of, or were aware of, such complaints. See Reilley Decl. ¶ 25; Stanton Decl. ¶ 18; Lennox Decl. ¶ 17. Thus, because plaintiff has failed to establish that Ms. Lennox, Ms. Reilley, and Ms. Stanton were personally involved in plaintiff's Eighth Amendment claim, it is recommended that defendants' motion on this ground be granted.

### d. Dr. Weinstock, Dr. Kooi, and Dr. Cincotta

Dr. Weinstock, Dr. Kooi, and Dr. Cincotta argue that they were not personally involved in a majority of plaintiff's allegations concerning his underlying Eighth Amendment claim as plaintiff never informed (1) Dr. Weinstock that he was denied an EEG, Boost, or Ensure; (2) Dr. Kooi that he was denied a CT scan, an EKG, an EEG, Boost, or Ensure; and

(3) Dr. Cincotta that he was denied a colonoscopy, endoscopy, a CT scan, an EEG, or an EKG. Def. Mem. of Law at 23.  Dr. Weinstock, Dr. Kooi, and Dr. Cincotta also contend that they were not continuously present at Auburn during the period that plaintiff was housed there.  Id.  First, the record is clear that Dr. Weinstock and Dr. Kooi could not have participated in any alleged Eighth Amendment violations that occurred after their retirements from DOCCS service on October 24, 2014 and April 29, 2015, respectively, and plaintiff has not proffered evidence disputing such facts.  See Weinstock Decl. ¶ 2; Kooi Decl. ¶ 2; see also Cicio v. Lamora, No. 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 n.6 (N.D.N.Y. Feb. 24, 2010) (dismissing the plaintiff's claims against the defendant "on the independent basis of his lack of personal involvement in the alleged constitutional violation" where the defendant "submitted an affidavit indicating that he was not present  during the course of the incident, and [the] plaintiff has offered no evidence to the contrary.").  Second, all three doctors declared, and plaintiff's medical records confirm, that plaintiff did not inform them of the abovementioned alleged denials.  See subsection III.D. infra, at 30-40.  Thus, because plaintiff has not demonstrated that Dr. Weinstock, Dr. Kooi, and Dr. Cincotta were personally involved in plaintiff's Eighth Amendment claim insofar as to any alleged denial of the above procedures or meal supplements, it is recommended that defendants' motion on this ground be granted.

### D. Eighth Amendment

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and

wanton infliction of pain." U.S. CONST. amend. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference standard consists of both an objective and subjective component. Hathaway, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Id. The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

As to the objective component, for an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006)). First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." Jones v. Westchester Cnty.

Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).  However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994).  Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious.  This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or likely will cause the prisoner." Id.

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower.  For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.  Thus, although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

Salahuddin, 467 F.3d at 280 (internal citation and quotation marks omitted).

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511

U.S. at 837.   "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" Wright v. Genovese, 684 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing Farmer, 511 U.S. at 844)). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 154-155 (quoting Salahuddin, 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

Plaintiff alleges that defendants deprived him of "all medical care, medical treatments," and medicine, including a denial of an MRI, back brace, knee brace, elbow brace, neck brace, and pain medicine. Compl. at 11, 15. At his deposition, plaintiff expanded on those initial claims, and alleged that defendants denied him medical care for

chronic pain in his neck, back, left shoulder, left elbow, right knee, callouses on his feet, and weight loss. Dkt. No. 59-14 ("Pl. Dep.") at 34-51. Plaintiff also claims defendants denied him a colonoscopy, an endoscopy, a CT scan, an EEG, an EKG, an MRI, Boost, Ensure, medical boots, and a referral to a neurosurgeon. Id.

The undersigned finds that plaintiff failed to provide evidence from which a fact-finder could reasonably conclude that defendants provided plaintiff with inadequate treatment; in fact, the record establishes the opposite.

### 1. Dr. Weinstock, Dr. Kooi, Dr. Cincotta

### a. Objective Component

Plaintiff has not demonstrated that Dr. Weinstock, Dr. Kooi, or Dr. Cincotta deprived him of adequate medical care. Dr. Weinstock declared that he met with plaintiff on two occasions. Dkt. No. 59-4 ("Weinstock Decl.") ¶ 8. On both occasions, in response to plaintiff's complaints of back pain, Dr. Weinstock evaluated plaintiff's condition, and altered his pain medication to ensure plaintiff's continued compliance. Id. ¶¶ 9, 15. On May 19, 2014, Dr. Weinstock ordered plaintiff a CT scan to evaluate a possible mass on his neck. Id. ¶¶ 9, 11. Immediately after his first appointment, Dr. Weinstock scheduled plaintiff for an EKG. Id. ¶ 10. On July 7, 2014, plaintiff complained of pain in his right hand, and Dr. Weinstock referred him for an X-ray. Id. ¶ 15. Dr. Weinstock examined plaintiff's callouses, and determined that they were minor and did not need further treatment. Id. Dr. Weinstock also referred plaintiff for an endoscopy to address his anemia, recent weight loss, and potential gastrointestinal bleeding. Id. ¶ 14.

Dr. Kooi declared that he met with plaintiff on six occasions.  Dkt. No. 59-5 ("Kooi Decl.") ¶¶ 8-16.  On November 6, 2014, in response to plaintiff's complaints of back pain, Dr. Kooi offered to demonstrate exercises plaintiff could perform to manage his pain, and provided Motrin.  Id. ¶¶ 8, 12.  On November 12 and November 21, 2014, Dr. Kooi treated plaintiff for a facial laceration.  Id. ¶¶ 10, 11.  On December 16, 2014, when plaintiff complained of foot pain, Dr. Kooi submitted a request for replacement of plaintiff's special-issued medical boots.  Id. ¶ 12.  On January 5, 2015, Dr. Kooi scheduled plaintiff for a colonoscopy, as per plaintiff's request.  Id. ¶ 13.  On February 24, 2015, Dr. Kooi provided plaintiff Mucinex for his cold symptoms, and Vitamin E to treat skin lesions.  Id. ¶ 16.

Dr. Cincotta declared that he met with plaintiff on two occasions.  Dkt. No. 59-6 ("Cincotta Decl.") ¶ 8.  At the May 13, 2015 appointment, Dr. Cincotta treated plaintiff's complaints of dry skin with Hydrocerin, and arthritis in his hand with Motrin.  Id. ¶ 9.  After evaluating plaintiff's knee and elbow, Dr. Cincotta ordered plaintiff knee and elbow braces. Id.  At the August 5, 2015 appointment, plaintiff complained of weight loss, difficulty drinking and swallowing; pain in his left elbow, back, neck, knee; and dry skin on his legs.  Id. ¶ 10. Dr. Cincotta scheduled plaintiff a complete physical examination, ordered new X-rays, and continued plaintiff's prescription for Mobic for pain relief.  Id.  In response to plaintiff's weight loss concerns, Dr. Cincotta ordered labs, including a Chemprofile, a complete blood count test, and a thyroid-stimulating hormone test.  Id.  To treat plaintiff's complaints of difficulty swallowing, Dr. Cincotta prescribed Prilosec and referred plaintiff to a specialist.  Id.

Dr. Weinstock, Dr. Kooi, and Dr. Cincotta's statements are consistent with plaintiff's medical records and his "Referral History," which establish that plaintiff's complaints of

callouses; dry skin; weight loss; and chronic pain in his back, knees, hands, and elbows were met with X-rays, pain medication, referrals for replacement of medical boots, blood work, and braces when determined appropriate. See Dkt. No. 60 ("Pl. Medical Rec.") at 25, 33, 47, 53, 60, 66, 122, 140, 141, 144, 145, 146, 147 (detailing plaintiff's medical and referral history from these doctors). Moreover, the record indicates that Dr. Weinstock and Dr. Kooi scheduled plaintiff for an endoscopy, a colonoscopy, CT scans, an EKG, X-rays, and blood work that he ultimately refused. See Pl. Medical Rec. at 67-76, 79, 134, 136, 137, 140, 143, 146, 148, 150, 151 (detailing Dr. Weinstock and Dr. Kooi's referrals for procedures and plaintiff's refusal); see also Weinstock Decl. ¶¶ 10, 12, 14, 16; Kooi Decl. ¶¶ 15.

Plaintiff's belief that a back brace would remedy his chronic pain and defendants' denial of this brace does not amount to inadequate medical care, see Pl. Medical Rec. at 66, as plaintiff's concerns constitute nothing more than disagreement with Dr. Weinstock and Dr. Kooi's treatment plans, which is not actionable under the Eighth Amendment. See Randle, 960 F. Supp. 2d at 481 (quoting Alston v. Bendheim, 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009) ("Indeed, '[a]n inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.'"). Accordingly, plaintiff has failed to establish that Dr. Weinstock, Dr. Kooi, and Dr. Cincotta deprived him of adequate medical care under the objective prong of the deliberate indifference analysis.

### b. Subjective Component

Although plaintiff fails to establish the objective component of the deliberate indifference test, and plaintiff must demonstrate both prongs to state a deliberate indifference claim, Hathaway, 37 F.3d at 66, for the sake of a complete analysis, the undersigned addresses the subjective component. Plaintiff fails to establish that Dr. Weinstock, Dr. Kooi, or Dr. Cincotta knew of and disregarded an "excessive risk" to his health under the subjective component. Farmer, 511 U.S. at 837. The record demonstrates that Dr. Weinstock, Dr. Kooi, or Dr. Cincotta addressed plaintiff's complaints through medication, referrals for medical procedures including CT scans, colonoscopies, endoscopies, and EKGs, and new medical boots. See subsection III.D.1.a, 2.a. supra, at 34-37, 40-41. Based on their own assessments of plaintiff's medical records, as well as physical tests conducted at the Auburn infirmary, both Dr. Weinstock and Dr. Kooi determined that plaintiff did not need a back brace to treat his pain symptoms. See Weinstock Decl. ¶ 9; Kooi Decl. ¶ 9. Instead, Dr. Weinstock prescribed plaintiff medication, and Dr. Kooi offered to teach plaintiff certain exercises to strengthen his back and manage his pain. See Weinstock Decl. ¶ 9; Kooi Decl. ¶ 9, 12. That plaintiff believed his pain required more or different treatment does not render Dr. Weinstock or Dr. Kooi's denial of that treatment an Eighth Amendment violation. See Randle, 960 F. Supp. 2d at 481 ("[A] difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.") (internal citations and quotation marks omitted). Inmates do not have a constitutional right to the treatment of their choice. See Wright, 694 F. Supp. 2d at 155 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ("[That the plaintiff] preferred an alternative treatment or believes that he did not get the medical attention he desired

38

does not rise to the level of a constitutional violation."). Although there is some indication in the record that plaintiff had a permit for a back brace to be used "in all facilities throughout his incarceration," Dkt. No. 60-1 at 53, plaintiff does not allege that defendants knew of and subsequently disregarded that knowledge. See Farmer, 511 U.S. at 837 (finding a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Further, to the extent that Dr. Weinstock or Dr. Kooi's assessment of plaintiff's need for a back brace differs from that of other medical providers, this allegation does not amount to a constitutional violation. See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted).

Moreover, to the extent that plaintiff refused his scheduled endoscopy, colonoscopies, CT scans, EKG, X-rays, and blood work, see, e.g., Pl. Medical Rec. at 67-76, 79, 134, 136, 137, 140, 143, 146, 148, 150, 151 (detailing Dr. Weinstock and Dr. Kooi's referrals for procedures and plaintiff's refusal); see also Weinstock Decl. ¶¶ 10, 12, 14, 16; Kooi Decl. ¶¶ 15, it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs." Nelson v. Deming, 140 F. Supp. 3d 248, 261 (W.D.N.Y. 2015) (citing Jones v. Smith, 784 F.2d 149, 152 (2d Cir. 1986)).

To the extent that plaintiff contends the delay in receiving his medical boots amounted to deliberate indifference, there is no indication in the record supporting a conclusion that defendants intentionally delayed his boots, nor is there any evidence that the boots were delayed as a form of punishment. See Crique v. Magill, No. 12 Civ. 3345(PAC)(GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) (internal citation and quotation marks omitted) ("While delays in providing necessary medical care may in some cases demonstrate deliberate indifference, the Second Circuit has reserved those instances to cases when prison officials deliberately delayed care as a form of punishment."). Instead, the record establishes that on December 16, 2014, after plaintiff complained of foot pain, Dr. Kooi timely submitted a referral for replacement medical boots. Pl. Medical Records at 114. Any subsequent delay in receipt of the medical boots was behind Dr. Kooi's control, and there is evidence in the record such delay was caused, in part, by a sizing issue. See id. at 83-88. It is clear that all defendants continued to treat plaintiff during the approximately one year it took for his replacement boots to arrive. See generally Pl. Medical Rec.

Moreover, even if Dr. Weinstock, Dr. Kooi, or Dr. Cincotta's decisions caused plaintiff unintended harm, negligence[12] is not actionable under section 1983. See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986)

---

[12] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

(concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F. Supp. 3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference.").  Thus, plaintiff has not demonstrated the existence of a material question of fact whether Dr. Weinstock, Dr. Kooi, Dr. Cincotta knew of and disregarded an excessive risk to his health or safety.  See Farmer, 511 U.S. 837.  Plaintiff fails to establish that Dr. Weinstock, Dr. Kooi, or Dr. Cincotta knew of and disregarded an "excessive risk" to his health" under the second prong of the deliberate indifference test.

Accordingly, plaintiff has failed to demonstrate that Dr. Weinstock, Dr. Kooi, or Dr. Cincotta were deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion be granted on this ground.

## 2. Ms. Lennox, Ms. Reilley, and Ms. Stanton

### a. Objective Component

Plaintiff has not demonstrated that Ms. Lennox, Ms. Reilley, or Ms. Stanton deprived him of adequate medical care.  As a preliminary matter, it is well-established in the record that Registered Nurses have "no authority to (1) prescribe or discontinue an inmate's medication or dietary supplements such as Boost or Ensure;[13] (2) refer an inmate for a colonoscopy, endoscopy, CT scan, MRI, EEG, EKG, or consultation with a neurosurgeon; (3) request special issue medical boots or shoes, a can, or braces."  Dkt. No. 59-7 ("Reilley Decl.") ¶ 4; Stanton Decl. ¶ 5; Dkt. No. 59-9 ("Lennox Decl.") ¶ 5.  As to medical services,

---

[13] Ms. Stanton further declared that a Nurse Practitioner had previously discontinued plaintiff's prescription for Boost due to non-compliance.  Dkt. No. 59-8 ("Stanton Decl.") ¶ 14; Coryer Decl. ¶ 14.

nurses may only provide certain over-the-counter medications to inmates, as prescribed by a physician. Reilley Decl. ¶ 3; Stanton Decl. ¶ 3; Lennox Decl. ¶ 3. Thus, to the extent that plaintiff contends that Ms. Lennox, Ms. Reilley, or Ms. Stanton denied him adequate medical care by failing to provide him with certain medications and/or nutritional supplements and refer him for outside procedures, his claims cannot stand as Ms. Lennox, Ms. Reilley, or Ms. Stanton lacked the authority to do so. See Alston v. Howard, 925 F. Supp. 1034, 1040 n.6 (S.D.N.Y. 1996) ("In addition, [the plaintiff] fails to state a claim against Nurse Howard, who had no authority to prescribe or deny him special footwear. As set forth above, prescriptions must be approved by the Facility Health Services director.").

As to plaintiff's remaining claims, the record indicates that Ms. Lennox, Ms. Reilley, and Ms. Stanton met with plaintiff on numerous occasions during sick call and provided plaintiff with over-the-counter medications like Medicidin-D, cough syrup, foot powder, hydrocortisone cream, Tylenol, and Motrin to treat his complaints of cold symptoms, chronic pain, dry skin, and athlete's foot. See Lennox Decl. ¶ 9; Reilley Decl. ¶ 9; Stanton Decl. ¶ 9; see, e.g., Pl. Medical Rec. at 54, 61, 63, 64, 65, 66 (demonstrating examples of Ms. Lennox, Ms. Reilley, and Ms. Stanton's distribution of over-the-counter medicine in response to plaintiff's complaints). Where Ms. Lennox, Ms. Reilley, or Ms. Stanton did not have the authority to meet plaintiff's needs, they informed him of an upcoming appointment where plaintiff could further address his concerns with his medical provider. See, e.g., Pl. Medical Rec. at 41 ("Instructed on care . . . has pending [review-by-date] 3-10-15."), 61 ("Instructed . . . to see provider [review-by-date] 7/28/14."). Accordingly, plaintiff has failed to establish that Ms. Lennox, Ms. Reilley, or Ms. Stanton deprived him of adequate medical

care under the objective prong of the deliberate indifference analysis.

## 2. Subjective Component

Although plaintiff fails to establish the objective component, for the sake of a complete analysis, the undersigned addresses the subjective component. Plaintiff fails to establish that Ms. Lennox, Ms. Reilley, or Ms. Stanton knew of and disregarded an "excessive risk" to his health" under the second prong. Farmer, 511 U.S. at 837. The record demonstrates that Ms. Lennox, Ms. Reilley, or Ms. Stanton addressed plaintiff's complaints to the extent they had the authority. See Reilley Decl. ¶ 4; Stanton Decl. ¶ 5; Lennox Decl. ¶ 5. Insofar as plaintiff refused sick call, Reilley Decl. ¶ 10, Stanton Decl. ¶ 10, Lennox Decl. ¶ 10, it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs." Nelson, 140 F. Supp. 3d at 261 (citing Jones, 784 F.2d at 152). Moreover, even if Ms. Lennox, Ms. Reilley, or Ms. Stanton's decisions caused plaintiff unintended harm, negligence[14] is not actionable under section 1983. See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted);

Thus, plaintiff has not demonstrated the existence of a material question of fact whether Ms. Lennox, Ms. Reilley, and Ms. Stanton knew of and disregarded an excessive

---

[14] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

risk to his health or safety.  See Farmer, 511 U.S. 837.  Accordingly, plaintiff has failed to demonstrate that defendants were deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion be granted on this ground.

### D. Qualified Immunity

Defendants argue that, even if plaintiff's Eighth Amendment claim is substantiated, they are entitled to qualified immunity.  Def. Mem. of Law at 24-25.  Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong

of the qualified immunity test.  See subsection III.D supra, at 30-40.  Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation.  See Aiken, 236 F. Supp. 2d at 230.  Accordingly, it is recommended that defendants' motion on this ground be granted.

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 59) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[15]

Dated: May 29, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[15] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).